**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Apr 05 2012, 9:02 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**KRISTEN D. FOSTER**
The Foster Group, PLLC
New Palestine, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**NICOLE M. SCHUSTER**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| DEBRA A. EDWARDS, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 30A04-1110-CR-528 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE HANCOCK SUPERIOR COURT
The Honorable Terry K. Snow, Judge
Cause No. 30D01-1008-FD-158

April 5, 2012

**MEMORANDUM DECISION – NOT FOR PUBLICATION**

**BAKER, Judge**

Appellant-defendant Debra A Edwards appeals her conviction for Theft,[1] a class D felony, claiming that the conviction must be set aside because the trial court erred in excluding the testimony of an allegedly biased material witness. Concluding that the trial court's decision to exclude the evidence did not constitute reversible error, we affirm the judgment of the trial court.

FACTS

Edwards had been an employee of Advance America Cash Advance (Advance America) for approximately six years. In June 2010, Edwards was working as the Center Manager for the Greenfield branch of Advance America. During that time, Terry Andis also worked at that same branch as assistant manager.

The district manager for the Greenfield branch left Advance America in March 2010, and that position had remained vacant since that time. As a result, Andis and Edwards were responsible for running the branch and managing the money, including the preparation of the company's daily bank deposits. Advance America's policy at the Greenfield branch was to keep $950 on hand for the next day. An additional $100 was kept in the "bait bag" in the event of a robbery. Tr. p. 44, 110. However, the employees were required to deposit all other monies received in the bank.

At a certain point, the employees were to prepare a deposit for the bank and place the cash in the plastic deposit sleeve in the safe. That process was to be verified by two individuals. At the end of the day, employees would leave the prepared deposits in the

---

[1] Ind. Code § 35-43-4-2.

2

sealed sleeves in the branch safe. The next morning, or the next business day following a Saturday, the employee would take the deposits to the bank. The employees were to wait while the money was counted by the teller and then bring back a receipt to the branch showing that the deposit had been made.

Edwards and Andis had fallen into the habit of making night deposits, a procedure that was supposed to occur only under certain conditions and only after a district manager had approved the process. Also, while the preparation of the deposits was supposed to be performed by a person other than the one who carried the money, the deposits were typically carried by Edwards, who would sign Andis's name to them.

On Saturday, June 26, 2010, the branch had two deposits, one for $3,000 and the other for $1,356.89. After preparing both deposits, Edwards left to take them to the bank on Monday, June 28, 2010, at approximately 10:00 a.m. Receipts from the bank indicate that the $3,000 deposit was processed on June 28, 2010 at 10:11 a.m. The second deposit of Saturday's receipts, for $1,356.89 was processed on June 29, 2010, at 9:12 a.m.

On June 28, 2010, the end of day summary indicated an amount of $1244.66 to be prepared for deposit. Edwards prepared the deposit and indicated that she would transport the funds to the night depository. Andis followed Edwards in her vehicle and saw Edwards turn into the bank as she drove by on her usual route home. Surveillance footage showed Edwards at the night depository at 6:15 p.m. that evening.

On June 29, 2010, Amy Perry, the Advance America Divisional Director of Operations, arrived to do an unscheduled audit of the Greenfield branch. Although that

3

branch was not in Perry's district, she offered to perform the audit because the Greenfield Branch had been without a district manager and an audit for a considerable time. Another representative, Robin McCallap, arrived later that afternoon to assist Perry.

Perry quickly discovered the unauthorized use of the night deposit procedures and taught Andis the company policies regarding such deposits. On June 30, 2010, Perry discovered that the proceeds from Monday, June 28, 2010, had been prepared and deposited by Edwards without receipt of a validation ticket from the bank.

When asked about the transaction, Edwards explained that she had not yet retrieved the validation ticket from the bank. Perry was concerned because if Edwards had made Monday's deposit in the night depository that night, the validation ticket from the bank should have been ready to be picked up on Tuesday. Edwards explained that Andis had followed her to the night depository and had pulled into the other lane to witness the deposit.

When Perry attempted to obtain verification of the deposit of Monday's receipts, the bank had no record of an Advance America deposit in their night depository for $1,244.66. The Chase Bank Branch used a dual control system for emptying the night depository vault in the morning, between 8:15 and 8:30 a.m., and in the evening around 5:00 p.m., so that two employees removed and reviewed the deposits. The deposit was never found by Chase Bank. In fact, the only deposit from Advance America received on June 29, 2010, was for $1356.89.

4

A review of the surveillance tapes from Chase Bank shows Edwards at the night depository on Monday, June 28, 2010, at 6:15 p.m. No other vehicle is visible in the other lane, and Edwards appears to have only one deposit. Advance America's internal surveillance videos from Saturday and Monday show Edwards preparing the deposits but not sealing the deposit sleeves. At some point, Andis related to Perry that Edwards wanted her to tell Perry that she followed Edwards to the bank to witness the night deposit. However, Andis could not say that because it was not true.

Following an investigation, the State charged Edwards with theft on August 26, 2010. During a jury trial that commenced on September 19, 2011, Andis testified for the State. Edwards wished to impeach Andis with evidence that she had previously been charged with the theft of $130,000 from a former employer in 2004. However, those charges had subsequently been dismissed. Edwards also sought to introduce evidence that Andis had been fired from a job at Gas America when it was discovered that some money was missing. The trial court did not permit Edwards's impeaching evidence at trial because the charges had not been reduced to a conviction.

Edwards testified that she prepared two deposits on Saturday, but only deposited one, for $3,000 on Monday morning "by accident." Tr. p. 238. Edwards then claimed that she made two separate deposits on Monday at the night depository. Edwards denied telling Perry that Andis had witnessed her make a night deposit on Monday.

5

The jury found Edwards guilty as charged, and the trial court subsequently sentenced Edwards to a term of eighteen months of incarceration, suspended, with eighteen months probation. Edwards now appeals.

DISCUSSION AND DECISION

As noted above, Edwards argues that her conviction must be reversed because the trial court did not permit her to impeach Andis with evidence of the fact that she had been charged with stealing money from BigFoot, and had been fired from another job after it was discovered that money had been missing from the company. In short, Edwards argues that the trial court abused its discretion in excluding this evidence.

I. Standard of Review

We initially observe that trial courts are afforded broad discretion in determining whether to admit or exclude evidence, and we review evidentiary determinations by trial courts for an abuse of discretion. Conrad v. State, 938 N.E.2d 852, 855 (Ind. Ct. App. 2010). An abuse of discretion occurs when the trial court's ruling is clearly against the logic, facts, and circumstances presented. Oatts v. State, 899 N.E.2d 714, 719 (Ind. Ct. App. 2009). An evidentiary error may not support reversal of a conviction unless the error affected the defendant's substantial rights. Id. Also, a trial court's evidentiary ruling will be sustained on appeal on any legal ground apparent in the record. Jester v. State, 724 N.E.2d 235, 240 (Ind. 2000).

We also note that relevant evidence, which is evidence having any tendency to make the existence of any fact of consequence more or less probable, is admissible. Ind.

6

Evidence Rules 401, 402. However, relevant evidence should nevertheless be excluded if the probative value of the evidence is substantially outweighed by its prejudicial effect. Jackson v. State, 712 N.E.2d 986, 988 (Ind. 1999).

## II. Edwards's Claims

In addressing Edwards's contention, we note that both the Federal and Indiana Constitutions provide that a defendant has the right to confront and cross-examine the witnesses against him. U.S. Const. Amend. 6; Ind. Const. art. I, § 13. Additionally, Indiana Evidence Rule 611(b) provides that

> Cross-examination should be limited to the subject matter of the direct examination and matters affecting the credibility of the witness. The court may permit inquiry into additional matters as if on direct examination.

The right of a defendant in a criminal case to confront a witness includes the right of full, adequate, and effective cross-examination. Hodges v. State, 524 N.E.2d 774, 782 (Ind. 1988). Only the complete denial of a cross-examination on an area concerning a witness's credibility will amount to the constitutional denial of the right to cross-examination and any less than the total denial of cross-examination is viewed as within the discretion of the trial court to regulate the scope of cross-examination. Fassoth v. State, 525 N.E.2d 318, 323 (Ind. 1988).

We also note that it is well-settled that in "Indiana, the credibility of a witness may not be impeached by specific acts of misconduct which have not been reduced to conviction." Saunders v. State, 848 N.E.2d 1117, 1123 (Ind. Ct. App. 2006).

7

As our Supreme Court held in Hatchett v. State, 503 N.E.2d 398, 403 (Ind. 1987), relying on the United States opinion in Davis v. Alaska, 415 U.S. 308 (1974), there is a difference between evidence of prior conduct offered to impeach the character of a witness and evidence offered to show the bias or prejudice of a crime.

As was explained in Davis:

> One way of discrediting the witness is to introduce evidence of a prior criminal conviction of that witness. By so doing the cross-examiner intends to afford the jury a basis to infer that the witness' character is such that he would be less likely than the average trustworthy citizen to be truthful in his testimony. The introduction of evidence of a prior crime is thus a general attack on the credibility of the witness. A more particular attack on the witness' credibility is effected by means of cross examination directed toward revealing possible biases, prejudice, or ulterior motives of the witness as they may relate directly to the issues or personalities in the case at hand. The partiality of a witness is subject to exploration at trial and is always relevant as discrediting the witness and affecting the weight of his testimony.

415 U.S. at 316.

A criminal history offered as a general impeachment of character is disallowed under Indiana's Evidence Rules unless the criminal history consists of certain crimes reduced to convictions. Id. at 404; Evid. R. 608(b), 609(a). On the other hand, it has also been determined that disallowing evidence of bias on the part of a witness can deprive a defendant of his or her Sixth Amendment right of confrontation. Hendricks, 554 N.E.2d at 1143.

In this case, it is apparent that the evidence Edwards sought to offer was the intent to cast suspicion on Andis as the more likely thief in light of her history, rather than

8

showing that Andis was biased. Indiana Evidence Rule 608 provides that specific instances of wrongdoing may not be inquired into or proved by extrinsic evidence for the purpose of attacking or supporting a witness' credibility, other than a conviction for a crime as provided in Evidence Rule 609. Therefore, Andis's prior circumstances were not subject to impeachment. See Beaty v. State, 856 N.E.2d 1264, 1269 (Ind. Ct. App. 2006) (observing that the defendant impermissibly desired to show that a witness had previously stolen items from a department store for the purpose of demonstrating that the witness was more likely to have been the thief in the instant case).

Notwithstanding the above, Edwards maintains that she desired to present evidence demonstrating that Andis was biased because there had been previous accusations against her and thus was motivated to testify for the State to avoid the "distress and prejudice that such accusations carry." Appellant's Br. p. 8. This particular motive is common to many State's witnesses. Therefore, it is not reversible error to "disallow cross-examination for bias and prejudice if the questioning would not give rise to a reasonable degree of probability of bias and prejudice." Hatchett, 503 N.E.2d at 404.

Here, there was no indication that Andis was testifying to gain any type of favor from the State. In other words, the State had not bargained for her testimony and Andis was not a suspect. Under these circumstances, we cannot say that the jury would have received a significantly different impression of Andis had Edwards been permitted to examine her about her past employment experiences. As a result, we conclude that the

9

trial court did not abuse its discretion in denying Edwards's request to present that evidence.

Finally, even assuming solely for the sake of argument that the trial court erred in refusing to allow Edwards to present the evidence regarding Andis, the error was harmless. Indeed, even if a criminal defendant is denied the opportunity to fully cross-examine witnesses about potential biases, the convictions will not be reversed if the State can prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained. Standifer v. State, 718 N.E.2d 1107, 1110 (Ind. 1999). And whether the trial court's error is harmless depends on several factors, including the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and the overall strength of the prosecution's case. Id. at 1111.

Here, although Andis may have been an important witness for the State, her evidence was corroborated by the fact that Edwards prepared Monday's deposit, and was recorded making a deposit at the night depository on Monday in accordance with her documentation. However, the deposit of Monday's proceeds never appeared at the bank. Therefore, any curtailment of Edwards's right to confront and cross-examine Andis was ultimately harmless error beyond a reasonable doubt. Id.

The judgment of the trial court is affirmed.

KIRSCH, J., and BROWN, J., concur.

10